IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

CALVIN L. MARSHALL
ADC #090207 PLAINTIFF

V. Case No. 2:22-CV-00135-LPR-BBM

KELLY MCCAIN, Nurse Practitioner, EARU; TRACY BENNETT, Nurse Practitioner, EARU; VALERIE WESTBROOK, Job Assignment/ Classification Officer, EARU; SHIAMEKIA GOLETT, LPN, EARU; MEIKO ASKEW, LPN, EARU; RITA WASHINGTON, LPN, EARU; DUNN, LPN, EARU; WILLIAMS, LPN, EARU; TURNER, LPN, EARU; STEPHEN LANE, Captain, Security Officer, EARU; ANTHONY JACKSON, Deputy Warden, EARU; GREGORY RECHCIGL, Health Service Administrator, EARU; RORY GRIFFIN, Director of Health Services and Programs, ADC; DOES, 1-9, EARU/ADC; and AUDREA CULCLAGER, ADC Deputy Director for Treatment Programs, in her official capacity DEFENDANTS

**RECOMMENDED DISPOSITION**

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge Lee P. Rudofsky. You may file written objections to all or part of this Recommendation. If you do so, those objections must (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within 14 days of the date of this Recommendation. If you do not file objections, the District Judge may adopt this Recommendation without independently reviewing all of the

evidence in the record. By not objecting, you may waive the right to appeal questions of fact.

## I. INTRODUCTION

On July 25, 2022, Plaintiff Calvin L. Marshall, an inmate in the East Arkansas Regional Unit ("EARU") of the Arkansas Division of Correction ("ADC"), filed a *pro se* Complaint under 42 U.S.C. § 1983, alleging violations of his constitutional rights. (Doc. 2). Marshall's claims largely revolve around two issues: (1) his objection to his work assignments in late 2020, and (2) the crushing of his pain medication, gabapentin, which began around the same time. *See id.* After the Court screened the allegations in accordance with the Prison Litigation Reform Act, Marshall is proceeding on work-assignment deliberate-indifference, medical-deliberate-indifference, retaliation, and corrective-inaction claims, (Doc. 10) (Doc. 12). Marshall sues Defendants in their individual and official capacities. (Doc. 2 at 1).

Defendants Williams, LPN ("Nurse Williams"), Turner, LPN ("Nurse Turner"), and the Does 1–9 have not been served. *See* (Doc. 59) (Doc. 69). Defendant Rory Griffin, former ADC Director of Health Services and Programs ("Director Griffin") is deceased and has not been substituted in his individual capacity. *See* (Doc. 102) (Doc. 121). The

remaining "Medical Defendants"[1] and "ADC Defendants"[2] have filed separate Motions for Summary Judgment, (Doc. 88) (Doc. 112), Briefs in Support, (Doc. 89) (Doc. 114), and Statements of Undisputed Facts, (Doc. 90) (Doc. 113). Marshall filed a Response to the Medical Defendants' Statement of Facts, (Doc. 111), but otherwise failed to respond.[3] The time for replies has passed. Thus, the issues are ready for disposition.

## II. BACKGROUND[4]

Marshall suffers from rheumatoid arthritis and requires ongoing medical care to relieve his related pain and discomfort. (Doc. 2 at 5–8) (Doc. 90-1 at 1, ¶ 4) (Doc. 112-7 at

---

[1] The remaining Medical Defendants are:
Kelly McCain, Nurse Practitioner ("NP McCain");
Tracey Bennett, Nurse Practitioner ("NP Bennett");
Shiamekia Golett, LPN ("Nurse Golett");
Meiko Askew, LPN ("Nurse Askew");
Rita Washington, LPN ("Nurse Washington");
Dunn, LPN ("Nurse Dunn"); and
Gregory Rechcigl, Health Services Administrator ("HSA Rechcigl").

[2] The remaining ADC Defendants are:
Valerie Westbrook, Job Assignment/Classification Officer ("Classification Officer Westbrook");
Stephen Lane, Captain, Security Officer ("Captain Lane");
Anthony Jackson, Deputy Warden ("Deputy Warden Jackson"); and
Andrea Culclager, ADC Deputy Director for Treatment Programs, in her official capacity ("Deputy Director Culclager")

[3] Because Marshall did not file a response to the ADC Defendants' Statement of Undisputed Material Facts, all of the material facts in that Statement are deemed admitted. LOCAL RULE 56.1(c). *See also* (Doc. 117) (informing Marshall of LOCAL RULE 56.1(c)).

[4] These facts are largely sourced from: (1) Marshall's notarized Complaint, (Doc. 2), *see Berry v. Doss*, 900 F.3d 1017, 1022 (8th Cir. 2018) (citing *Ward v. Moore*, 414 F.3d 968, 970 (8th Cir. 2005); *Spear v. Dayton's*, 733 F.2d 554, 555–56 (8th Cir. 1984)); (2) the Medical Defendants' exhibits (Docs. 90-1 to 90-48), which include portions of Marshall's medical records and a doctor's affidavit, (Doc. 90-1); and (3) the ADC Defendants' admitted Statement of Undisputed Material Facts, (Doc. 113), and the supporting exhibits, which include Marshall's deposition, (Doc. 112-7), Marshall's work-assignment history, (Doc. 112-4 at 6–12), relevant ADC policies (Doc. 118) (sealed), and Marshall's electronic medication administration record, (Doc. 112-2 at 3–73).

12:5–7). He has been prescribed a variety of pain medications over the years but receives the best results from gabapentin. (Doc. 2 at 8, ¶ 30).

Marshall began taking gabapentin in 2014. (Doc. 2 at 25). The record before the Court begins in 2020 and shows Marshall's prescription for gabapentin as of April 14, 2020. (Doc. 112-2 at 5). At that time, the order was for Marshall to receive the medication "Three Times a Day As Needed," and the instructions for delivery were for the medication to be "Crushed in Water/Watch Swallow." (Doc. 112-2 at 5). There is no evidence showing which physician or medical provider originally entered the order requiring the medication to be crushed. *See* (Doc. 112-1 at 3, ¶¶ 18–19). But the delivery method was consistent with an ADC policy *allowing* "[a]ll solid doses of medications commonly or potentially abused by inmates [to] be administered as 'crush and cover.'" (Doc. 112-1 at 3, ¶ 20) (Doc. 117, Ex. B at 50, ¶ 18) (sealed).[5] However, the ADC policy does not *require* that any medication be crushed[6] and goes on to state: "Medication with specific manufacturer or clinical recommendations for 'Do Not Crush' shall supersede the potential for abuse." (Doc. 117, Ex. B at 50, ¶ 18) (sealed).

---

[5] The ADC Defendants were granted leave to file the exhibits to Shelly Byer's Declaration, (Doc. 112-1)—"Exhibit A, ADC Operational Policy/Procedure on Medication Administration Training, 409.00." and "Exhibit B, ADC Pharmacy Manual for Correctional Facilities"—under seal "to prevent sensitive operational vulnerabilities from being exploited by the inmate population." (Doc. 117) (citing (Doc. 115)). Pursuant to Court Order, Marshall was given time to review the sealed documents, but he refused. (Doc. 119) (Doc. 119-1).

[6] The Medical Defendants submit the affidavit of the Regional Vice President for Wellpath, LLC, Dona Buie, who states that "Pursuant to Department of Correction Policy, gabapentin must be crushed and covered prior to administration to inmates." (Doc. 90-7 at 1, ¶ 3). But the Medical Defendants produce no such written policy and cite no other source or explanation for Ms. Buie's statement. Notably, the policy produced by ADC Defendants does not support Buie's contention. Thus, the Court assumes, at most, that there is a practice among Wellpath staff to crush gabapentin because it is a medication "commonly or potentially abused by inmates." (Doc. 117, Ex. B at 50, ¶ 18) (sealed).

In 2020, Marshall received gabapentin three times a day, as ordered, from various nurses—including Nurses Golett, Askew, Washington, and Dunn. (Doc. 112-2 at 5–10, 12–19). But, at least initially, the medication was not crushed. (Doc. 2 at 25, 59–60, ¶¶ 90, 196). Marshall contends that changed when he began complaining about his work assignment in late 2020. *See* (Doc. 2 at 25, ¶ 90).

In 2020, the EARU—like the rest of the world—was grappling with the COVID-19 pandemic. (Doc. 112-4 at 4, ¶ 32). Inmate movement was restricted, *id.*, and, as Marshall puts it, "nobody worked much during" that time. (Doc. 112-7 at 73:8–9). Although all eligible inmates were provided with work assignments, only those with work assignments that were "essential for prison operation" were required to work. (Doc. 112-4 at 4, ¶¶ 33–34).

For most of the year, Marshall was ineligible for a work assignment because he was a restrictive-housing inmate. (Doc. 112-4 at 2, ¶ 10) (Doc. 112-4 at 6). But, from June 2 to July 10, he was assigned to field utility work, (Doc. 112-4 at 6)—a non-essential work assignment, (Doc. 112-4 at 4, ¶ 34). And, on August 14, after Marshall was again released from restrictive housing, Classification Officer Westbrook assigned Marshall to non-essential field utility work. (Doc. 112-4 at 6). In doing so, Classification Officer Westbrook did not have access to Marshall's medical records and, instead, relied on Marshall's health class and restrictions that were issued by the medical staff. (Doc. 113 at 3, ¶¶ 17–21). And, at that time, Marshall did not have any medical restrictions that would have prevented his assignment to field utility. (Doc. 113 at 5, ¶ 32) (Doc. 112-7 at 55:23–56:23).

Despite working "very little, if at all" in 2020, (Doc. 112-4 at 4) (Doc. 112-7 at 73:22–74:3), Marshall took issue with his work assignment. *See* (Doc. 2 at 9–10). He notes that he had previously been assigned to field utility work and "received numerous job[-]related major disciplinary write-ups and punishments for not being able to perform the job due to his medical conditions." (Doc. 2 at 10, ¶¶ 37–38).

So, on October 15, during an examination with Dr. Warmoth—a non-prison or "outside" rheumatologist—Marshall complained that he was being assigned job duties that aggravated his medical conditions. (Doc. 2 at 10–15) (Doc. 90-4). Because Marshall believed he would best be able to perform the job of barracks porter, he asked Dr. Warmoth to write a recommendation that he be limited to performing that job. (Doc. 2 at 10–15). Dr. Warmoth provided the requested recommendation, noting in a letter that Marshall had "significant activity" of his "inflammatory arthritis" and "was not able to participate in activities with significant physical demand." (Doc. 90-4 at 2). Dr. Warmoth also recommended that Marshall continue methotrexate and folic acid for his arthritis and be referred to a gastroenterologist based on complaints of blood in his stool. (Doc. 2 at 12, ¶¶ 45–46) (Doc. 90-4 at 1).

On October 16, NP Bennett, a prison or "onsite" medical provider, reviewed Dr. Warmoth's recommendations. (Doc. 90-4 at 1–2). She noted that prison medical staff could prescribe restrictions but could not assign a specific job duty, (Doc. 90-4 at 2), and that Marshall had not reported any gastroenterological complaints to prison medical staff, (Doc. 90-4 at 1). Although NP Bennett provided Marshall additional work restrictions, (Doc. 2 at 17, 21) (Doc. 90-3 at 1–3) (Doc. 112-2 at 72), the restrictions did not prevent Marshall

from being assigned field utility work, (Doc. 2 at 17, ¶ 63). Even so, that same day, Classification Officer Westbrook reassigned Marshall to building utility work (not to his requested position of barracks porter). (Doc. 2 at 20).

On October 20, NP Bennett attempted to conduct a physical examination of Marshall and discuss the rheumatology visit and recommendations. (Doc. 90-5); *see* (Doc. 2 at 15–18). Marshall acknowledged that NP Bennett modified his work restrictions but argued that he "need[ed] to be the barracks porter[,] not work outside." (Doc. 90-5) (all caps omitted). NP Bennett wrote that Marshall "would not cooperate with assessment or discussion regar[d]ing his physical exam….[and] was asked to leave the infirmary." *Id.*; (Doc. 90-6).

On October 25 and November 1, Marshall filed grievances against Classification Officer Westbrook and NP Bennett for not "honoring" Dr. Warmoth's work-assignment recommendation of barracks porter. (Doc. 2 at 18, 22) (Doc. 39-4 at 3) (Doc. 39-5 at 3). On November 2, HSA Rechcigl responded to the November 1 grievance: "Outside providers can only make recommendations. It is up to the onsite unit providers to determine the plan of care. Records show on 10/16/20 medical issued [illegible] 3 scripts related to work restrictions. Medical does not assign jobs." (Doc. 39-5 at 3).

On November 2, a grievance officer asked Classification Officer Westbrook and HSA Rechcigl to respond to Marshall's October 25 grievance. *See* (Doc. 39-4 at 5, 9). They both responded on November 3. *Id.* Classification Officer Westbrook wrote that, on the same date Marshall's health classification was changed, he was assigned to building utility.

(Doc. 39-4 at 5). HSA Rechcigl reiterated that "Outside providers can only make recommendations. It is up to the site provider to determine plan of care." (Doc. 39-4 at 9).

At the noon pill call on November 3, Nurse Golett—for the first time—crushed Marshall's gabapentin pill. (Doc. 112-2 at 32) (Doc. 2 at 24–25, ¶¶ 87–90). Marshall refused the crushed pill because it was crushed outside his presence, and he could not confirm that the pill was gabapentin. (Doc. 2 at 25–27). Nurse Golett stated that she was told to crush the pill but would not tell Marshall who directed her to do so. (Doc. 2 at 26, ¶ 94). Marshall asked if Nurse Golett would bring the pill-crusher with her and crush the pill in his presence. (Doc. 2 at 26, ¶ 95). But Nurse Golett refused, stating, "No, I'm not going to bring the crusher. Per [ADC] policy, I don't have to crush your pill in front of you."[7] *Id.* Although the medical record shows that Marhsall refused his gabapentin again on the evening of November 3, (Doc. 112-2 at 32), Marshall states that he accepted the crushed medication "with much trepidation," (Doc. 2 at 28, ¶ 102).

Marshall states that Nurses Askew, Washington, Dunn, Williams, and Turner also began crushing his gabapentin shortly after he filed the grievances about his work assignment. (Doc. 2 at 59–60, ¶ 196). But Nurses Washington, Dunn, Williams, and Turner crushed the pills in Marshall's presence,[8] (Doc. 2 at 69, ¶ 225), which Marshall "had no

[7] Based on the Court's review of the ADC policy, it anticipates that medication be crushed in the "medication preparation area," which "includes a device that is specifically used for crushing medication." (Doc. 117, Ex. B at 48, ¶ 14) (sealed). The policy is silent on whether the medication may or may not be crushed in front of the inmate. *See id.* at 46–50, 55–56 (ADC Manual for Correctional Facilities: Medication Administration – General Guidelines, Equipment and Supplies for Administering Medications) (sealed).

[8] The record is silent about whether Nurse Askew crushed the gabapentin in Marshall's presence.

problem with [] because [he] knew what [he] was taking." (Doc. 112-7 at 75:5–7). And the record shows that Marshall accepted all crushed gabapentin administered to him by Nurses Askew, Washington, Dunn, and Turner.[9] (Doc. 112-2 at 32–37, 48–51).

On December 3, NP McCain saw Marshall for an appointment and renewed his gabapentin prescription. (Doc. 90-8 at 1–2). There is no record of Marshall complaining about being provided crushed medication during that appointment. *See id.*, (Doc. 2). And the delivery method of "Crushed in Water/Watch Swallow" remained in place. *See* (Doc. 112-2 at 36).

On December 5 and 6, Nurse Golett again provided Marshall with medication that was crushed outside his presence. (Doc. 2 at 30–31). Marshall accepted the crushed medication on both occasions. (Doc. 2 at 30–31) (Doc. 112-2 at 37). But, after consuming the crushed pill on December 6, Marshall began to feel sick to his stomach, and he forced himself to throw up "whatever it was that [Nurse Golett] had given him." (Doc. 2 at 31, ¶ 111) (Doc. 12-7 at 83:16–24).

On December 7, Nurse Golett again provided Marshall with gabapentin that was crushed outside his presence. (Doc. 2 at 31–33). This time, Marshall refused to take the medicine and asked for the "zone sergeant." (Doc. 2 at 31–33). Captain Lane was one of the officers that responded to his call. (Doc. 2 at 31–33). Marshall asked Captain Lane to allow him "to take his gabapentin in solid form." (Doc. 2 at 32, ¶ 114). But, as a supervisor

[9] The record does not show any nurse named Williams administering gabapentin to Marshall. *See* (Doc. 112-2); *see also* (Doc. 59 at 6–7) (noting that, after being ordered to do so by the Court, no served Defendants could identify Nurse Williams from their records).

of corrections officers, not medical staff, Captain Lane had no authority over Nurse Golett's administration of the medication. (Doc. 112-5 at 2, ¶¶ 12–15). Captain Lane and Nurse Golett left with the crushed pill. (Doc. 2 at 31–33). And Marshall was not given any gabapentin or alternative pain medication on that date. (Doc. 2 at 31–33).

That same day, NP McCain discontinued Marshall's gabapentin prescription. (Doc. 90-9). She noted that Marshall "becomes combative and physically abusive to nursing staff due to the pill being crushed" and that he "accuse[d] staff of 'not giving the right medication.'" *Id.* She also noted that Marshall wanted to watch the pill being crushed, but she concluded that it was a "safety issue." *Id.* NP McCain prescribed Marshall another pain medication, duloxetine, that did not have to be crushed. *Id.*

On January 11, 2021, Marshall was seen at sick call by NP McCain. (Doc. 90-12 at 1–2). He complained that that the duloxetine was not controlling his pain and requested to be put back on gabapentin. *Id.* NP McCain obliged but cautioned Marshall "that the policy to crush gabapentin is not negotiable." *Id.*

On February 8, Nurse Golett again provided Marshall powdered medication, which Marshall thought looked like "powder cocaine." (Doc. 2 at 36, ¶ 127). On February 9, 2021, NP McCain wrote a note in Marshall's medical record:

> Notified by nursing staff that Mr. Marshall is again causing issues with crushing Gabapentin. As per our discussion at the last visit, he was agreeable to resume this medication and follow crush/float policy. Staff reports security was involved in most recent. Staff took the medication on the second pill pass, he would not take his meds or return them to staff. Lt. was called and he refused to give medications to him. Lt. then had to get pepper spray and additional officers to attempt to retrieve the meds. Marshall then poured the medication down the toilet and said the next encounter with this particular staff member he is going to try to kill her.

> For this reason I have discontinued the Gabapentin. This provider WILL NOT prescribe this medication for this inmate again. He must see Dr. Kerstein for any pain management needs.

(Doc. 90-15); *see also* (Doc. 2 at 145). Marshall contends that he was never threatened with pepper spray. (Doc. 112-7 at 75:18–20). But, as far as the Court can tell, he does not otherwise dispute the February 8 interaction with Nurse Golett—including the fact that he threatened to kill her and flushed the medication. *See* (Doc. 90 at 3, ¶ 11) (Doc. 111 at 3, ¶ 11) (citing (Doc. 2 at 36–61, 101–102, 122, ¶¶ 127–203, 312, 387)).

On February 11, Marshall asked NP Bennett to renew his gabapentin prescription and iterated that he did not want it crushed. (Doc. 90-16 at 1). NP Bennett declined the request, noting that Marshall "has had several interactions with staff regarding the crush/float policy that required security intervention" and that Marshall had threatened to kill a nurse and flushed the medication down the toilet. *Id.* at 2. She told Marshall that it was "policy" to crush his gabapentin and that policy did not require the medication to be crushed in his presence. *Id.* She, instead, prescribed Toradol (which Marshall refused) and acetaminophen for his pain. *Id.* Finally, she wrote that "[Marshall] has an upcoming rheumatology consult and we will wait to see what are the **suggestions** from the specialist." *Id.* (all caps omitted; otherwise, as written).

On February 23, Marshall reported to a non-party nurse that he had blood in his stool since starting the acetaminophen. (Doc. 90-17 at 1). He stated that the bloody stool occurred anytime he took acetaminophen, so he had stopped taking it. *Id.* He requested to be put back on gabapentin, and the nurse referred him to a provider for evaluation of the bloody stool and uncontrolled pain. *Id.*

Marshall was seen by NP Bennett on February 26, who again refused to restart his gabapentin prescription. (Doc. 90-18). She noted that Marshall had refused both Toradol and acetaminophen and again wrote that the "**suggestions**" from the upcoming rheumatologist consult would be considered. *Id.* (emphasis in original).

Over the next two months, Marshall continued to complain of pain and request gabapentin. (Docs. 90-20 to 90-26). His requests were denied in favor of other pain relief measures and medication, such as daily stretching, self-massage, warm showers, position changes, Medrol, and acetaminophen. *Id.*, *see e.g.* (Doc. 90-21 at 2) (Doc. 90-26 at 2). On at least one other occasion, Marshall was aggressive toward medical staff. (Doc. 90-23).

On April 29, 2021, Marshall attended his outside rheumatologist consult with Dr. Warmoth. (Doc. 2 at 98) (Doc. 90-28). Dr. Warmoth found that Marshall had "active synovitis[[10]] indicative of <u>uncontrolled</u> disease." (Doc. 90-28) (emphasis in original). She recommended that Marshall's gabapentin prescription be renewed with the note "do not crush!"[11] (Doc. 90-28). She also recommended that Marshall be prescribed Humira and asked that all medication changes be communicated to her. (Doc. 90-28)

[10] "Inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." *Synovitis*, Stedman's Medical Dictionary 891270 (2014).

[11] According to Marshall, Dr. Warmoth told him that gabapentin should not be crushed because it could cause stomach problems and questioned why he had not yet seen a gastroenterologist, as she recommended during the October 15, 2020 visit. (Doc. 2 at 98). But those statements are inadmissible hearsay that are inappropriate for consideration at the summary judgment stage. *Brooks v. Tri-Sys., Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) ("When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment."); *see also Elsharkawy v. Chicago Lakes Sch. Dist. Bd. of Educ.*, 183 F.4th 580, 594 (8th Cir. 2026).

NP Bennett reviewed Dr. Warmoth's recommendations. (Doc. 90-28) (Doc. 90-29). She scheduled Marshall for a consult with a separate outside provider regarding the Humira prescription. (Doc. 90-28) (Doc. 90-29). But she declined to renew Marshall's gabapentin because "gabapentin is not prescribed in whole tablet form." (Doc. 90-28) (Doc. 90-29). On May 10, NP McCain discussed Dr. Warmoth's recommendations and resulting plan of care with Marshall. (Doc. 90-29). NP McCain reiterated the "policy" regarding gabapentin and told Marshall to follow-up with sick call as needed. *Id.*

On May 13, Marshall was transported to Regional One Health ("ROH") for a Humira consult. (Doc. 90-30). The ROH provider affirmed the recommendation for Humira—to be administered every two weeks—*id.*, and, on May 17, the medication was ordered by NP McCain. (Doc. 90-31). Marshall received his first injection on May 28. (Doc. 2 at 110, ¶ 338) (Doc. 112-2 at 56).

After a June 10 rheumatology consult, Dr. Warmoth noted that Marshall had a ganglion cyst[12] on this left hand and complained of "continued lower gastrointestinal bleeding." (Doc. 90-34). Dr. Warmoth again recommended uncrushed gabapentin and a gastrointestinal referral. (Doc. 90-34). NP Bennett again denied the gabapentin recommendation; she made no comment regarding the gastrointestinal referral. *Id.*

On June 11, Marshall received his second Humira injection. (Doc. 2 at 111, ¶ 355) (Doc. 112-2 at 56). The next day, he began experiencing migraine headaches. (Doc. 2 at

[12] "A cyst containing mucopolysaccharide-rich fluid within fibrous tissue or, occasionally, muscle bone or a semilunar cartilage; usually attached to a tendon sheath in the hand, wrist, or foot, or connected with the underlying joint." *Ganglion*, Stedman's Medical Dictionary 360980 (2014).

111, 356). Because he did not have migraines before taking Humira, Marshall blamed the migraines and ganglion cyst on the new medication. *Id.* at 111–112, ¶¶ 356–357. And, after two injections, Marshall began refusing Humira. (Doc. 112-2 at 56) (Doc. 90-36 at 1) (Doc. 90-37 to Doc. 90-40). The medication was ultimately discontinued due to non-compliance. (Doc. 112-2 at 56).

On June 21, Marshall was seen by NP Bennett. (Doc. 90-36 at 1). She discussed the denial of gabapentin and asked Marshall why he had not used the sick call process to report blood in his stool. *Id.* He responded, "I told you that's why I can't take Tylenol!" *Id.* (all caps omitted). NP Bennett ordered a fecal occult blood test and rectal exam. *Id.* at 2. But Marshall refused. *Id.*; (Doc. 90-37).

On August 27, Marshall was scheduled for a chronic-care visit, but he refused because he "did not put in a sick call." (Doc. 90-41 to Doc. 90-42). And, on October 15, after Marshall again refused sick call and Humira, NP Bennett discontinued Marshall's rheumatology consults as not "medically necessary." (Doc. 90-43 to Doc. 90-44). NP Bennett tried to see Marshall again on October 22, but he again refused. (Doc. 90-43) (Doc. 90-45). So, NP Bennett again found "no clinical need" for a rheumatology follow-up. (Doc. 90-43). Marshall continued to receive the rheumatologist-recommended methotrexate and folic acid. (Doc. 90-46 to Doc. 90-48) (Doc. 112-7 at 20:19–21:13).

According to Marshall, he filed over 24 grievances related to his work classification and medical treatment. *See* (Doc. 2 at 162). Deputy Warden Jackson, HSA Rechcigl, and Director Griffin were among the officials who processed and responded to those grievances. *See, e.g.,* (Doc. 112-6 at 7) (Doc. 2 at 44–46).

In support of their Motion for Summary Judgment, the Medical Defendants submit the affidavit of a family practice physician, Dr. Mahlon Maris. (Doc. 90-1). Dr. Maris states that he reviewed Marshall's medical records from October 2020 to July 2022 and, based on his education, training, and experience, "NP McCain and NP Bennett ordered appropriate medications to address Mr. Marshall's pain, and nursing staff administered the medication per orders and policy. When Mr. Mar[sh]all refused crushed gabapentin, medical staff attempted to offer him appropriate substitutions, including duloxetine, Toradol and Tylenol." *Id.* at 2, ¶ 7. He also opines that "Marshall did not report gastroenterology concerns necessitating a gastroenterology referral and refused testing to determine any GI bleeding." *Id.* at 2, ¶ 8. He concludes with his belief "that the medical care and treatment provided from October 2020 to July 2022 was appropriate and adequate." *Id.* at 2, ¶ 9.

## III. DISCUSSION

Defendants contend that, among other reasons, they are entitled to summary judgment in their individual capacities because: (1) NP Bennett and Classification Officer Westbrook were not deliberately indifferent regarding Marshall's work assignment (Doc. 89 at 5) (Doc. 114 at 13–15); (2) Marshall has presented no evidence in support of his retaliation claim against the Medical Defendants, (Doc. 89 at 5–6); (3) the Medical Defendants did not deliberately disregard Marshall's serious medical needs, (Doc. 89 at 5); and (4) the corrective-inaction claims against Captain Lane, Deputy Warden Jackson, and HSA Rechcigl fail for lack of an underlying constitutional violation by their subordinates, (Doc. 89 at 7) (Doc. 114 at 16). The ADC Defendants also argue they are entitled to

sovereign immunity in their official capacities, (Doc. 114 at 5), and point out that Director Griffin is deceased, and no party has been substituted for him in his individual capacity, (Doc. 114 at 2–3).

For the reasons set forth below, the Court recommends that the Motions for Summary Judgment be granted; judgment be entered in favor of the Medical Defendants and ADC Defendants; and the claims against Nurse Williams, Nurse Turner, Doe Defendants 1–9, and Director Griffin be dismissed without prejudice.

**A. Deliberate Indifference to Work Assignment**

Marshall's first claim is that, in August 2020, Classification Officer Westbrook assigned him to a field utility job that he was unable to perform due to his medical conditions. (Doc. 2 at 9–10). Then, when Dr. Warmoth recommended that Marshall be limited to the work assignment of barracks porter in October 2020, Classification Officer Westbrook and NP Bennett refused to assign Marshall that job. *Id.* at 10–22.

The Eighth Amendment grants prisoners the right to be free from cruel and unusual punishment—a right which extends to conditions of confinement, including prison work assignments. *Joseph v. Wheeler*, 144 F.4th 1111, 1113 (8th Cir. 2025) (citations omitted). To maintain an Eighth Amendment conditions-of-confinement claim, Marshall must "prove both an objective element, which asks whether the deprivation was sufficiently serious, and a subjective element, which asks whether the defendant officials acted with…deliberate indifference." *Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir. 1993).

For the objective prong, the allegations must demonstrate that Marshall was "incarcerated under conditions posing a substantial risk of serious harm." *Kulkay v. Roy*,

847 F.3d 637, 642 (8th Cir. 2017) (cleaned up). "[I]n the prison work assignment context, prison officials are deliberately indifferent when they knowingly compel an inmate to perform labor that is beyond the inmate's strength, dangerous to his or her life or health, or unduly painful." *Id.* at 643 (cleaned up).

Marshall alleges that *prior* to the events at issue, he was unable to perform field utility work due to his health conditions. (Doc. 2 at 10). But, during the relevant time, Marshall admits he was not required to actually perform any work duties because of COVID-19 restrictions. (Doc. 112-4 at 4, ¶¶ 32–34) (Doc. 112-7 at 72:24–74:3). He also presents no evidence that he was unable to perform the building-utility job he was assigned in lieu of the barracks-porter position. Thus, there is no evidence that Classification Officer Westbrook or NP Bennett compelled Marshall to perform work assignments that posed a risk of harm to his health, and they are entitled to summary judgment on Marshall's work-assignment claims.

**B. Retaliation**

Marshall's retaliation claim is based on allegations that, after he filed grievances against Classification Officer Westbrook and NP Bennett regarding his work assignment, Nurses Golett, Askew, Washington, and Dunn[13] began crushing his gabapentin and were motivated, "at least in part," by his grievances. (Doc. 2 at 25, 29, 59–60, 69). Specifically, Marshall filed grievances on October 25 and November 1, 2020 (Doc. 39-4 at 3) (Doc. 39-5 at 3), and they began crushing his gabapentin on November 3, 2020, (Doc. 112-2 at 32).

[13] Marshall also brings this claim against Nurse Williams, Nurse Turner, and other Doe nurses. *See* (Doc. 12 at 1–2). But those Defendants have not been served, and the claims against them will be discussed in Section III(F)(1) below.

To establish a First Amendment retaliation claim, Marshall must show that: (1) he engaged in activity protected by the First Amendment; (2) Defendants took adverse actions against Marshall that would chill a prisoner of ordinary firmness from engaging in that activity; and (3) Marshall's protected activities were the "but-for cause" of Defendants' adverse actions. *De Rossitte v. Correct Care Sols., LLC.*, 22 F.4th 796, 804 (8th Cir. 2022); *Santiago v. Blair*, 707 F.3d 984, 992–93 (8th Cir. 2013); *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019). It is undisputed that Marshall engaged in protected First Amendment activity by filing grievances. (Doc. 89 at 6); *Gonzalez v. Bendt*, 971 F.3d 742, 744–45 (8th Cir. 2020) (citations omitted). Marshall's retaliation claim fails, however, on the other two prongs.

**1. No Adverse Action**

Marshall claims that Nurses Golett, Askew, Washington, and Dunn took adverse actions against him by crushing his gabapentin. But Marshall testified that he "had no problem" with taking the gabapentin in a crushed form, as long as it was crushed in his presence. (Doc. 112-7 at 75:5–7). Based on the record, the only nurse who crushed the gabapentin outside his presence was Nurse Golett. Thus, Marshall's retaliation claim against all other nurses fails for lack of an adverse action.

Notwithstanding, Marshall's claim against Nurse Golett also fails for lack of an adverse action. The law asks whether the "adverse action" would chill a prisoner *of ordinary firmness* from continuing to file grievances. *Santiago*, 707 F.3d at 992. This test "is designed to weed out trivial matters from substantial violations of the First Amendment." *Gonzalez*, 971 F.3d at 745. Although not dispositive, a plaintiff's own

actions can be indicative of how a prisoner of ordinary firmness would react to the alleged retaliation. *Id.*

Marshall puts forth no evidence or argument explaining how receiving pre-crushed medication would dissuade a prisoner of ordinary firmness from continuing to file grievances. And, as Defendants points out, Marshall, himself, continued to file grievances after medical staff began crushing his medication. (Doc. 89 at 6); *see* (Doc. 2 at 162). Because there is insufficient evidence showing that any nurse took adverse action, summary judgment is appropriate on Marshall's retaliation claims. *Gonzalez*, 971 F.3d at 745.

**2. No Causal Connection**

Even if Marshall could show an adverse action, summary judgment is still appropriate because Marshall has not established a causal connection between the filing of his grievances and the subsequent decision to start crushing his gabapentin. In the prison context, "claims of unlawful retaliation must be treated with skepticism," and prisoners face a substantial burden in showing that a prison official's actions would not have occurred "but for" a retaliatory motive. *Sisneros v. Nix*, 95 F.3d 749, 752 (8th Cir. 1996); *see Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012); *see also Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam) (holding that speculative and conclusory allegations cannot support a retaliation claim).

To be sure, there is a close temporal connection between Marshall's October 25 and November 1 grievances and the first dispersal of crushed gabapentin on November 3. But that is where the evidenced connection between the two events ends. "[T]his temporal

proximity, *by itself*, cannot show retaliatory motive." *Skalsky v. Indep. Sch. Dist. No. 743*, 772 F.3d 1126, 1131 (8th Cir. 2014) (emphasis added); *but cf. Spencer v. Jackson Cnty. Mo.*, 738 F.3d 907, 912–13 (8th Cir. 2013) (close temporal timing was "strong evidence" of retaliation, but, in addition, the "defendants offered no nonretaliatory motive").

On the record before the Court, there is no evidence that Nurse Golett or any of the other nurses were aware of Marshall's grievances. They were not involved in responding to the grievances. *See* (Doc. 39-4) (Doc. 39-5). And, while it is unknown who—if anyone—told Nurse Golett and the other nurses to begin crushing the gabapentin in November 2020, the record establishes that the order to crush Marshall's medication was in place well before Marshall filed his grievances. *See* (Doc. 112-2 at 5).

Even assuming that the nurses knew about the grievances, the evidence shows other motivations for crushing Marshall's medication—namely, that there was a provider's order that the medication be crushed and, at that time, no counter-recommendation that it should not be crushed.[14] "[A]lthough it may be dishonorable to act with an unconstitutional motive, an official's action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Nieves*, 587 U.S. at 399 (cleaned up).

Ultimately, the burden was on Marshall to come forward with evidence that his grievance was the "but for" cause of his crushed gabapentin; he failed to meet that burden.

[14] Dr. Warmoth did not enter her first recommendation for non-crushed gabapentin until April 29, 2021. (Doc. 90-28).

Accordingly, summary judgment is also appropriate on the causal-connection prong of Marshall's retaliation claim.

### C. Medical Deliberate Indifference

Marshall's next claims are those of medical deliberate indifference against the Medical Defendants. First, against Nurses Golett, Askew, Washington, and Dunn,[15] Marshall brings a claim based on their alleged interference with the proper delivery of his gabapentin. *See* (Doc. 10 at 9–10) (Doc. 12 at 1). Then, against NP McCain and NP Bennett, Marshall brings claims based on their alleged roles in discontinuing his gabapentin and for failing to provide him the gastroenterology treatment recommended by Dr. Warmoth. *See* (Doc. 10 at 10) (Doc. 12 at 2).

"The Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs." *A.H. v. St. Louis County, Mo.*, 891 F.3d 721, 726 (8th Cir. 2018). To prevail on his medical-deliberate-indifference claim against the Medical Defendants, Marshall must establish that (1) he had an objectively serious medical need; and (2) the Medical Defendants knew of but deliberately disregarded that need. *Cannon v. Dehner*, 112 F.4th 580, 586 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 1149 (2025).

#### 1. Serious Medical Need

"An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily

[15] Marshall also brings this claim against Nurse Williams, Nurse Turner, and other Doe nurses. *See* (Doc. 12 at 1–2). But those Defendants have not been served, and the claims against them will be discussed in Section III(F)(1) below.

recognize the necessity for a doctor's attention." *Dalen v. Harpstead*, 123 F.4th 900, 904 (8th Cir. 2024) (cleaned up). The serious-medical-need inquiry is an in-depth analysis that may turn on such issues as the timing of the diagnosis compared to the alleged inadequate treatment. *See id.* (finding that a diagnosis made five months prior to incarceration did not satisfy the serious-medical-need standard); *see also Cannon*, 112 F.4th at 586.

Here, there are two alleged serious medical needs at issue: Marshall's rheumatoid arthritis and the blood in his stool. Marshall was diagnosed with rheumatoid arthritis in 2014 and has received treatment since that time; thus, it qualifies as a serious medical need.

Marshall's complaints of blood in his stool, however, fail to chin the bar. There are few recorded incidents of Marshall's gastrointestinal complaints. First, on October 15, 2020, Marshall complained to Dr. Warmoth about blood in his stool. (Doc. 90-4). She recommended that Marshall be referred to a gastroenterologist for his complaints, but there is no indication that, in her position as Marshall's rheumatologist, she personally observed or otherwise confirmed the blood in his stool. *See id.* And, at that time, Marshall had never reported the bleeding to any prison medical provider or nurse. *Id.* Thus, the issue was not diagnosed nor was it so obvious that a layperson would recognize the need for a doctor's attention.

Marshall next reported to a non-party prison nurse, on February 23, 2021, that acetaminophen caused him to have blood in his stool. (Doc. 90-17 at 1). So, he stopped taking the acetaminophen. *Id.* The nurse recorded that she conducted no evaluation and observed no signs or symptoms. *Id.* at 1–2. She referred him to a provider for evaluation of the "*possibly* bloody stools." *Id.* at 1. (emphasis added). Thus, like Dr. Warmoth, the

nurse did not personally observe any evidence of bleeding, and the issue was not diagnosed. And, given Marshall's statement that he had stopped taking the medication that allegedly caused the issue, it would not have been obvious to a layperson that it needed a doctor's attention. Indeed, when Marshall was seen three days later by a provider, the issue of bloody stool did not come up. *See* (Doc. 90-18).

Marshall did not complain again about blood in his stool until he saw Dr. Warmoth again on June 10, 2021. (Doc. 90-34). She again recommended a gastrointestinal referral. *Id.* But, when NP Bennett tried to follow-up regarding the issue on June 21, Marshall refused the examinations necessary to confirm and diagnose the issue. (Doc. 90-36 at 1–2); (Doc. 90-1 at 2, ¶ 8). This is the final discussion of bloody stools in the record. Thus, at no point were Marshall's complaints of bloody stool confirmed or diagnosed as needing medical treatment. Marshall's scattered complaints of gastrointestinal bleeding, therefore, did not constitute a serious medical need.

Having determined that the only serious medical need at issue is Marshall's rheumatoid arthritis, the inquiry then becomes whether the Medical Defendants deliberately disregarded that need.

**2. Deliberate Disregard**

A plaintiff can show deliberate disregard or "deliberate indifference in the level of care provided in different ways," including by "showing grossly incompetent or inadequate care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant *intentionally delayed* or denied *access to medical care*." *Dantzler v. Baldwin*, 133 F.4th 833, 846 (8th Cir. 2025) (internal quotation marks and

citation omitted). "Deliberate indifference may include…intentionally interfering with treatment or medication that has been prescribed." *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995).

However, "[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Dalen*, 123 F.4th at 904 (citation omitted). "To make a submissible case of deliberate indifference, [Marshall] must present sufficient evidence to support a finding that [Medical Defendants] recognized that a substantial risk of harm existed and knew their conduct was inappropriate in light of that risk." *Na'im v. Beck*, 172 F.4th 1013, 1018 (8th Cir. 2026).

<u>Nurse Defendants</u>. Marshall claims that Nurses Golett, Askew, Washington, and Dunn were deliberately indifferent to his rheumatoid arthritis by crushing, and therefore, interfering with his gabapentin. As an initial matter, there is no evidence showing that any nurse, save for Nurse Golett, was aware that Marshall objected to his gabapentin being crushed. In fact, the evidence shows that Marshall did *not* object to crushed gabapentin, as long as it was done in his presence—which all nurses, save Nurse Golett, did. (Doc. 112-7 at 112-7 at 75:3–11). Thus, there is no evidence that Nurses Askew, Washington, and Dunn were aware that crushing Marshall's gabapentin was harmful or that crushing it was inappropriate, and they are entitled to summary judgment. *Na'im*, 172 F.4th at 1018.

Marshall did inform Nurse Golett that he did not want his gabapentin crushed outside his presence because he was worried about being administered the wrong medication. (Doc. 2 at 24–27) (Doc. 112-7 at 74:22–75:12). Viewing the evidence in a light

most favorable to Marshall, Nurse Golett was also aware that Marshall felt sick after taking the crushed medication on December 6, 2020, and that he made himself throw up afterwards. (Doc. 2 at 31–32) (stating that Marshall told security officers about the vomiting but, presumably, in Nurse Golett's presence). Yet, this one instance of vomiting does not establish that continuing to crush the gabapentin outside Marshall's presence posed a substantial risk of harm. Any purported harm was based on Marshall's *speculation* that Nurse Golett provided him the wrong pill and might do so again, "and speculation is not sufficient to survive a motion for summary judgment." *Dulany v. Carnahan*, 132 F.3d 1234, 1241 (8th Cir. 1997).

More pointedly, none of the nurses—including Nurse Golett—interfered with Marshall's gabapentin *as it was prescribed*. At all times they administered the medication, there was a provider's order directing that Marshall's medication be crushed. *See* (Doc. 112-2 at 5–37, 48–51) (Doc. 112-1 at 3, ¶¶ 18–19). Their reliance on the provider's order does not show deliberate indifference. *See Shipp v. Arnold*, No. 4:18-CV-4017, 2020 WL 4006334, at *8 (W.D. Ark. July 15, 2020), *aff'd sub nom. Shipp v. Murphy*, 9 F.4th 694 (8th Cir. 2021) (finding nurse acted "reasonably" by deferring to the doctor's chosen course of action and noting that defendants are not liable if they respond responsibly to a known risk) (citation omitted)). Because the evidence establishes that Nurses Golett, Askew, Washington, and Dunn were not deliberately indifferent to Marshall's serious medical needs by providing him his medication, as prescribed, they are entitled to summary judgment.

Nurse Practitioner Defendants. Marshall claims that NP McCain and NP Bennett were deliberately indifferent to his rheumatoid arthritis based on their roles in discontinuing his gabapentin prescription. On December 7, 2020, Marshall's gabapentin prescription was first discontinued by NP McCain after Marshall became "combative and physically abusive to staff" over receiving a crushed pill. (Doc. 90-9). Marshall was prescribed a different pain medication. *Id.*

NP McCain briefly renewed the prescription, until Marshall threated to kill Nurse Golett and flushed the crushed medication. (Doc. 90-15). He was again prescribed alternative pain medications by Nurse Bennett. *Id.* When Marshall continued to complain of pain over the ensuing months and requested that the gabapentin be re-prescribed, his requests were denied in favor of other pain relief measures and medication. (Docs. 90-18 to 90-40). Marshall continued to receive his long-standing non-pain medication to treat his rheumatoid arthritis, methotrexate and folic acid, (Doc. 112-7 at 20:19–21:13), and denied an additional non-pain medication, Humira, recommended by his rheumatologist, (Doc. 90-28) (Doc. 112-2 at 56).

All that said, the real tension in this case comes from NP McCain's and NP Bennett's apparently mistaken belief that an ADC policy required the gabapentin to be crushed and from Dr. Warmoth's repeated recommendations that the medication not be crushed. But a mistaken belief amounts, at most, to negligence. It does not meet the high standard of deliberate indifference, "which requires a highly culpable state of mind approaching actual intent to harm the inmate." *Joseph v. Wheeler*, 144 F.4th 1111, 1113 (8th Cir. 2025). And a disagreement between medical providers regarding the appropriate

course of treatment does not establish deliberate indifference. *See Na'im*, 172 F.4th at 1018 (finding no deliberate indifference where defendants rejected x-ray technician's recommendation that plaintiff be taken to the hospital and chose their own course of treatment); *Richardson v. Gardner*, No. 3:23-CV-00119-KGB, 2025 WL 2731006, at *2 (E.D. Ark. Sept. 25, 2025) (finding doctor was allowed to exercise his own independent medical judgment in prescribing medication in crushed form, despite another doctor recommending the medication not be crushed and no written ADC policy requiring the medication be crushed).

The Medical Defendants' expert opined that NP McCain and NP Bennett ordered appropriate substitutions for gabapentin and that all medical care provided to Marshall between October 2020 to July 2022 was "appropriate and adequate." (Doc. 90-1 at ¶¶ 7, 9). "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." *Na'im*, 172 F.4th at 1019 (citing *Dulany*, 132 F.3d at 1240).

In the end, Marshall's medical-deliberate-indifference claims against NP McCain and NP Bennett amount to nothing more than a disagreement with their treatment decisions. Marshall wanted uncrushed gabapentin but was, instead, prescribed appropriate alternative pain medication. His disagreement with the course of treatment does not show deliberate indifference. *Dalen*, 123 F.4th at 904; *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019) ("[Prisoner's] disagreement with [defendants'] decision to offer him over-the-counter pain medications, rather than prescription medications, does not constitute

deliberate indifference."); *see also Richardson*, 2025 WL 2731006, at *2 (finding doctor was not deliberately indifferent by discontinuing medication that prisoner refused to take in crushed form). And NP McCain and NP Bennett are entitled to summary judgment.

### D. Corrective Inaction/Failure to Supervise

Marshall's final individual-capacity claims are against Captain Lane, Deputy Warden Jackson, and HSA Rechcigl,[16] based on allegations that, as supervisors, they were aware of the unconstitutional conduct against Marshall and failed to take corrective action. *See* (Doc. 10 at 10) (Doc. 12 at 2). But, because there is no evidence of any underlying constitutional violation by any of their subordinates, the failure-to-supervise claims against Captain Lane, Deputy Warden Jackson, and HSA Rechcigl necessarily fail. *See Engesser v. Fox*, 993 F.3d 626, 631–32 (8th Cir. 2021); *Morris v. Cradduck*, 954 F.3d 1055, 1060 (8th Cir. 2020).

### E. Official-Capacity Claims

Marshall also sues all Defendants in their official capacities. (Doc. 2 at 1). But, like the failure-to-supervise claims, any official-capacity claim fails for lack of an underlying constitutional violation. *Morris*, 954 F.3d at 1060; *Whitney v. City of St. Louis*, *Missouri*, 887 F.3d 857, 860–61 (8th Cir. 2018).

[16] Marshall also brings this claim against Director Griffin. *See* (Doc. 12 at 2). But that Defendant has not been substituted in his individual capacity, and the claims against him will be discussed in Section III(F)(2) below.

**F. Unserved, Unidentified, and Unsubstituted Defendants**

Having recommended judgment be entered in favor of the Medical Defendants and ADC Defendants, the Court turns to the unserved, unidentified, and unsubstituted Defendants—Nurse Williams, Nurse Turner, Doe Defendants 1–9, and Director Griffin.

**1. Nurse Williams, Nurse Turner, and Doe Defendants 1–9**

After screening the Complaint, the Court contacted Wellpath, LLC, in an attempt to serve the Defendants purportedly in its employ, including Nurse Williams and Nurse Turner. Wellpath, however, was unable to identify those Defendants based on the limited information provided by Marshall. *See* (Doc. 24 at 1). On November 20, 2023, the Court notified Marshall that, despite the efforts from the Court and Wellpath, it remained Marshall's burden to provide the information necessary to serve the Defendants. *Id.* (citing *Lee v. Armontrout*, 991 F.2d 487, 489 (8th Cir. 1993); *Coleman v. Newton*, 334 F. App'x 52, 53 (8th Cir. 2009)). The Court instructed Marshall that, if he wished to pursue his claims against Defendants Nurse Williams and Nurse Turner, he must provide additional identifying information for those Defendants. (Doc. 24 at 1–2). The Court allowed Marshall to conduct discovery to identify those individuals, *id*. at 2, and ordered Marshall to file a motion for service, containing the information necessary to identify Nurse Williams, Nurse Turner, and the Doe Defendants by May 10, 2024. (Doc. 34 at 2).

After Judge Rudofsky directed Defendants to provide additional identifying information, (Doc. 52), Defendants were still unable to identify Nurse Williams, (Doc. 59 at 6–7). And service on "Meredith Turner" at her last-known-address was returned undeliverable. (Doc. 68). So, Marshall's time to file a motion for service containing the

information necessary to identify Nurse Williams and Nurse Turner was extended to October 13, 2025. (Doc. 69 at 2–3). He was again warned that his failure to do so may result in the dismissal of his claims against those Defendants. *Id.* at 2. No such motion was filed.

Under Rule 4(m) of the Federal Rules of Civil Procedure, the Court "*must* dismiss the action" against a defendant that is not served within ninety days of the complaint unless the plaintiff shows "good cause." FED. R. CIV. P. 4(m) (emphasis added). And, even if good cause is shown, the Court may only "extend the time for service for *an appropriate period*." *Id.* (emphasis added). Marshall has been warned repeatedly of his duty to diligently prosecute his case, respond to the Court's orders, and identify the unserved Defendants. (Doc. 3 at 1) (Doc. 13 at 2) (Doc. 24 at 1–2) (Doc. 69 at 2). Given these warnings, and Marshall's lack of action, there is no "good cause" to extend the time for service. And, with more than four years since the Complaint was filed, the "appropriate" time for service has passed. Therefore, it is recommended that Marshall's claims against Nurse Williams, Nurse Turner, and the Doe Defendants be dismissed without prejudice for lack of service. FED. R. CIV. P. 4(m); *Lee*, 991 F.2d at 489.

**2. Director Griffin**

On April 27, 2026, counsel for the ADC Defendants filed a Suggestion of Death, stating that Director Griffin passed away on March 25, 2024. (Doc. 102). Attached to the Suggestion of Death was Director Griffin's obituary. (Doc. 102-1). Because Director Griffin was sued in both his individual and official capacity, Deputy Director Culclager

was automatically substituted for Director Griffin, in his official capacity only. FED. R. CIV. P. 25(d); (Doc. 121).

But the individual-capacity claim is controlled by Rule 25(a)(1) of the Federal Rules of Civil Procedure, which provides that, "[i]f a party dies and the claim is not extinguished," a motion to substitute a proper party for the decedent must be "made within 90 days after service of a statement noting the death," or "the action . . . by or against the decedent *must* be dismissed." FED. R. CIV. P. 25(a)(1) (emphasis added). "A motion for substitution may be made by any party or by the decedent's successor or representative." *Id.*

Defendants served the Suggestion of Death on April 27, 2026, by sending it to Marshall's address of record. (Doc. 102 at 2). *See* FED. R. CIV. P. 5(b)(2)(C) (providing that service may be made by "mailing it to the person's last known address—in which event service is complete upon mailing"). Thus, under Rules 25(a)(1) and 6(d) of the Federal Rules of Civil Procedure, Marshall had 93 days, or until July 29, 2026, to file a motion to substitute a proper party for Director Griffin. *See* FED. R. CIV. P. 6(d) (providing an additional three days for a party to act when service is made by mail). No such motion has been filed, and the time to do so has passed.

Accordingly, it is recommended that, pursuant to Rule 25(a)(1), Marshall's action against Director Griffin, in his individual capacity, be dismissed without prejudice. *See Zanowick v. Baxter Healthcare Corp.*, 850 F.3d 1090, 1095 (9th Cir. 2017) (collecting cases and finding that district courts have discretion under Rule 25(a)(1) to dismiss with or without prejudice).

## IV. CONCLUSION

IT IS THEREFORE RECOMMENDED THAT:

1. The Medical Defendants' Motion for Summary Judgment, (Doc. 88), be GRANTED.

2. The ADC Defendants' Motion for Summary Judgment, (Doc. 112), be GRANTED.

3. Judgment be entered in favor of Defendants on the following claims:

   (a) Marshall's Eighth Amendment work-assignment deliberate-indifference claims against Classification Officer Westbrook and NP Bennett;

   (b) Marshall's First Amendment retaliation claims against Nurse Golett, Nurse Askew, Nurse Washington, and Nurse Dunn;

   (c) Marshall's Eighth Amendment medical-deliberate-indifference claims against Nurse Golett, Nurse Askew, Nurse Washington, Nurse Dunn, NP McCain, and NP Bennett;

   (d) Marshall's corrective-inaction claims against Captain Lane, Deputy Warden Jackson, and HSA Rechcigl; and

   (e) Marshall's official-capacity claims against Classification Officer Westbrook, Nurse Golett, Nurse Askew, Nurse Washington, Nurse Dunn, NP McCain, NP Bennett, Captain Lane, Deputy Warden Jackson, HSA Rechcigl, and Deputy Director Culclager.

4. Marshall's claims against Nurse Williams, Nurse Turner, Doe Defendants 1–9, and Director Griffin in his individual capacity be DISMISSED without prejudice.

5. Judgment be entered accordingly.[17]

[17] All other claims were previously dismissed without prejudice for failure to state a claim upon which relief may be granted. (Doc. 12 at 2).

DATED this 4th day of September, 2026.

UNITED STATES MAGISTRATE JUDGE